**UNITED STATES of America, Appellee,**

v.

**Charles SCHWARZ, Thomas Wiese, and Thomas Bruder, Defendants–Appellants,**

**Justin A. Volpe and Michael Bellomo, Defendants.**

**Nos. 00–1479, 00–1483 and 00–1515.**

United States Court of Appeals, Second Circuit.

Argued July 19, 2001.

Decided July 26, 2001.

---

Barbara Underwood, Assistant United States Attorney (Alan Vinegrad, David C. James, Lauren Resnick, Assistant United States Attorneys, of counsel; Loretta E. Lynch, United States Attorney, on the brief), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, for Appellee.

Diarmuid White (Ronald P. Fischetti, Mark L. Freyberg, Brendan White, of counsel), New York, NY, for Defendant–Appellant Charles Schwarz.

Richard M. Asche, Litman, Asche & Gioiella, LLP (Joseph Tacopina, Russell M. Gioiella, Howard S. Weiner, of counsel), New York, NY, for Defendant–Appellant Thomas Wiese.

Jeremy Gutman (Stuart London, Worth Longworth Bamundo & London, of counsel), New York, NY, for Defendant–Appellant Thomas Bruder.

Before WALKER, Chief Judge, CABRANES and STRAUB, Circuit Judges.

PER CURIAM:

We write for the limited purpose of addressing appellants' claim that the Government violated its obligation to disclose exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

**I**

We assume familiarity with the facts of this case, which are presented in detail in an opinion of the United States District Court for the Eastern District of New York (Eugene H. Nickerson, *Judge* ). *See United States v. Bruder,* 103 F.Supp.2d 155 (E.D.N.Y.2000). We summarize below only the facts relevant to the issues presented here.

On August 9, 1997, Abner Louima was arrested following an altercation outside a club in Brooklyn, New York. Once Louima was handcuffed, appellants Charles

Schwarz and Thomas Wiese—New York City police officers—placed him into their patrol car to take him to the 70th Precinct. It is undisputed that Schwarz was the driver of the patrol car, that Wiese was the front-seat passenger, and that Louima rode in the back seat.

Louima testified that the car stopped three times en route to the precinct station and that, during two of these stops, he was beaten by four police officers. Schwarz, Wiese, as well as two other police officers—appellant Thomas Bruder and defendant Justin Volpe—were later charged with participating in these assaults.

At the precinct station, Schwarz searched Louima, removed his wallet and cash from his pockets, and completed a standard "pedigree card" for him. A police officer then led Louima to a public bathroom in the back of the stationhouse. Volpe would ultimately confess that, in the bathroom, he kicked and punched Louima and forced a broken broomstick about six inches into Louima's rectum, causing severe internal injuries. Louima testified that a second police officer was also in the bathroom, and that this officer took part in the assault. Louima claimed that the second officer was "the driver" of the patrol car, but he could not positively identify Schwarz as "the driver."

In February 1998, a twelve-count superseding indictment was returned that, inter alia, charged Schwarz, Wiese, Bruder, and Volpe with conspiring to assault and assaulting Louima in the patrol car, in violation of 18 U.S.C. §§ 241 and 242; charged Volpe and Schwarz with conspiring to assault and assaulting Louima in the bathroom of the precinct station, in violation of 18 U.S.C. §§ 241 and 242; and charged Schwarz, Wiese, and Bruder with conspiring to obstruct justice in connection with the federal grand-jury investigation into the assault, in violation of 18 U.S.C. §§ 371 and 1503.

The charges against defendants were tried before juries in two separate trials. See United States v. Volpe, 42 F.Supp.2d 204, 209 (E.D.N.Y.1999) (severing the case into two trials). The first trial primarily concerned the charges of deprivation of civil rights relating to the alleged assaults on Louima in the police car and in the bathroom, and the second trial concerned only the charge of conspiracy to obstruct justice.

In the course of the first trial, Volpe pleaded guilty to six counts of the indictment, including assaulting Louima in the police car and in the bathroom. See United States v. Volpe, 224 F.3d 72, 74 (2d Cir.2000). Following Volpe's plea, a key issue remaining at the first trial was whether Schwarz was the police officer who had led Louima to the bathroom. This issue was central because the jury could have inferred that the officer who had led Louima to the bathroom was the same person who, according to Louima, participated with Volpe in assaulting him.

Schwarz denied any participation in the assault and denied that he had led Louima to the bathroom. He contended that Louima had fabricated the story that two officers were present in the bathroom during the assault, and claimed that he had remained in the front desk area of the stationhouse when Louima was led to the bathroom.[1]

The Government argued, on the other hand, that Schwarz had led Louima to the bathroom and then, together with Volpe, assaulted him. To support this argument, the Government presented two witnesses

---

1. At the second trial, Schwarz also testified that, during the time of the attack on Louima, he went out to search the rear area of his police car as required by patrol guidelines.

who testified that they had seen Schwarz lead Louima toward the back of the stationhouse. There are two rooms in the back of the stationhouse: the Arrest Room and, farther down a corridor but beyond the line of sight of much of the floor, the bathroom. One of the Government's witnesses, officer Mark Schofield, testified that he had seen Schwarz escort Louima from the main desk toward the back of the stationhouse, but had not seen them walk past the Arrest Room. The second Government witness, officer Eric Turetzky, testified that he had seen Schwarz escort Louima from the main desk area toward the back of the stationhouse, past the Arrest Room, and down the corridor that leads to the bathroom.

On June 2, 1999, the jury in the first trial acquitted Schwarz, Wiese, and Bruder of assaulting Louima in the police car, but convicted Schwarz of participating in the assault in the stationhouse bathroom. Presumably, the jury had rejected Schwarz's defense and had credited Turetzky's testimony that Schwarz was the officer who had brought Louima to the bathroom.

On March 6, 2000, a second jury found Schwarz, Wiese, and Bruder guilty of conspiring to obstruct justice in connection with the grand-jury investigation into the assault.

Following the two convictions, the District Court sentenced Schwarz principally to 188 months' imprisonment, 5 years' supervised release, and restitution to Louima in the amount of $277,495; and Wiese and Bruder each principally to 60 months' imprisonment and 3 years' supervised release. *See Bruder*, 103 F.Supp.2d at 185, 190.[2] *Schwarz is now serving his sentence, and Wiese and Bruder are at liberty pending the disposition of this appeal.*

## II

On appeal, appellants challenge the judgments of conviction resulting from the first and second trials on various grounds; they claim, *inter alia*, that the Government failed to discharge its duties under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *and Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Specifically, appellants argue that the Government suppressed information that could have been used to impeach Turetzky's testimony—a pillar of the Government's case against Schwarz in the first trial and (more indirectly) its case against all defendants in the second trial.

The asserted *Brady* and/or *Giglio* material at issue here consists primarily of discrete and readily identifiable materials—namely, tapes and transcripts of statements made by police officers in hearings ("GO–15 hearings") conducted by the Internal Affairs Bureau ("IAB") of the New York City Police Department; summaries of the GO–15 hearings in possession of federal prosecutors; and reports of the Federal Bureau of Investigation ("FBI") of interviews of persons who had earlier testified in the GO–15 hearings.

In both trials, appellants moved for an order compelling the production of exculpatory material or impeachment material within the meaning of *Brady* and *Giglio*, or, in the alternative, for an in camera inspection of the above material to determine whether any of it contained exculpatory or impeachment information. The

---

**2.** Following his guilty plea, Volpe was sentenced principally to 30 years' imprisonment, 5 years' supervised release, and restitution of approximately $281,000. We affirmed this sentence after it was challenged on appeal. *See United States v. Volpe*, 224 F.3d 72 (2d Cir.2000).

District Court denied both motions. · *See United States v. Volpe,*. 42 F.Supp.2d 204, 226–28 (E.D.N.Y.1999) *(*denying the motion in the first trial); *United States v. Bruder,* No. 98 CR 196 (E.D.N.Y. Jan. 31, 2000) (denying the motion in the second trial without comment).

To consider the *Brady/Giglio* claim on appeal, we ordered the Government to provide appellants and this Court, under seal and pursuant to a protective order, all statements made at the GO–15 hearings (including any summaries of these statements) and all reports of FBI interviews of persons who had testified in the GO–15 hearings. *See United States v. Volpe,* No. 00–1479 (2d Cir. June 28, 2001)(order requiring filing with the Court); *United States v. Volpe,* No. 00–1479 (2d Cir. July 6, 2001) (protective order requiring disclosure to defendants). We also ordered appellants, upon review of these materials, to file under seal any supplemental brief that they deemed appropriate to address the *Brady/Giglio* claim. *See United States v.*

*Volpe,* No. 00–1479, ¶ 3 (2d Cir. July 6, 2001).

·Pursuant to our order, Schwarz's counsel provided us with, *inter alia,* an affidavit from a retired police sergeant, to whom we refer as Officer F.[3] In his affidavit, Officer F claims that, six days after the assault on Louima, Turetzky told him (in the presence of at least one other police officer) that he was unsure who had brought Louima to the bathroom. According to Officer F, "Turetzky said that he saw *either Officer Thomas Wiese or Charles Schwarz* walking Louima toward the bathroom, but that Turetzky could not say which officer it was *because he only saw them from the rear and Wiese and Schwarz look alike from that position.*" Affidavit of Officer F ¶ 3 (emphasis added).[4] Officer F further explained that he "went over Turetzky's observations with him numerous times," but that each time Turetzky repeated that "he could not tell whether the officer he saw walking Louima toward the bathroom was Wiese or Schwarz." Id. According to Officer F, he

---

**3.** We refer to the retired police sergeant as Officer F pursuant to our sealed order of July 18, 2001, which designated letters for certain police officers to be used at oral argument. *See United States v. Volpe,* No. 00–1479 (2d Cir. July 18, 2001) (sealed order).

**4.** At the second trial, but not at the first, a statement made by Wiese under a grant of prosecutorial immunity (other than for obstruction of justice and perjury) was admitted into evidence. In this statement, Wiese explained that Volpe and he (rather than Schwarz) had escorted Louima from the front desk toward the arrest room. According to Wiese, Volpe then made a sharp turn toward the bathroom and told Wiese that he wanted to "clean up" the blood on Louima's face; while Volpe and Louima were in the bathroom with the door closed, Wiese remained outside with the stationhouse dog. Wiese claimed that, during the attack, he heard several thumps coming from inside the bathroom, but that he remained outside with the

stationhouse dog until after the assault was over. · Upon discovering the atrocious attack, Wiese claims to have yelled, "[W]hat are you crazy, what's going on?" and then helped Louima to the Arrest Room.

Schwarz's defense at the first trial and testimony at the second trial was consistent with Wiese's account, insofar as Schwarz claimed not to have escorted Louima to the bathroom or to have participated in the assault. Volpe also corroborated Wiese's account at the second trial when Volpe testified that Wiese, not Schwarz, had escorted Louima to the bathroom.

At the first trial, Schwarz sought to introduce into evidence a statement by Wiese containing similar information, but the District Court held the statement to be inadmissible hearsay. *See United States v. Volpe,* 42 F.Supp.2d at 213–16. The District Court rejected Schwarz's argument that Wiese's statement was admissible as a statement against Wiese's interest. *See id.* No appellant challenges that decision here.

told a police captain of the IAB about the details of his interview with Turetzky and offered to write a report on the matter; however, the captain told him not to write the report, and Officer F complied. *See id.* ¶ 5. Two weeks later, Officer F attests, a lieutenant from the Brooklyn South Investigations Unit contacted Officer F, and Officer F told him of the details of his interview with Turetzky. *See id. %57 7.* Officer F claims, however, that no IAB or federal investigator contacted him thereafter. *See id.* ¶ 8.

### III

We are presented with the question of whether the Government suppressed exculpatory and impeachment material that might have been relevant—indeed, crucial—to the defense, in particular because it would have weakened the testimony of Turetzky, the key Government witness who placed Schwarz and Louima past the Arrest Room and near the bathroom.[5] Late in these proceedings, appellants have presented us with an affidavit from Officer F to support their *Brady/Giglio* claim. The Government, however, contests Officer F's affidavit both "factually and legally."

We express no view on this issue; however, we pause to recall that the Government violates its duty under *Brady* if it suppresses "material" evidence favorable to an accused. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194. In order for evidence to be "material" within the meaning of *Brady*, a defendant does not need to show that the evidence, if disclosed, would have resulted in his acquittal; rather, he needs to show only that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *see also United States v. Bagley*, 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the general rule of *Brady*." (internal quotation marks and brackets omitted)); *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996) ("Evidence of impeachment is material ... where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." (internal quotation marks omitted)). We also note that in evaluating a *Brady* claim, a court must consider the cumulative effect of all material withheld by the Government. *See Kyles*, 514 U.S. at 436–37, 115 S.Ct. 1555.

We are mindful that newly presented materials—such as the affidavit of Officer F—may be the subject of later proceedings before the District Court and before us in the form of a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.[6] *See, e.g., United States v. Dansker*, 537 F.2d 40, 65 (3d Cir.1976) (recognizing that appellants

---

5. We note that Turetzky's alleged statement to Officer F that "Wiese and Schwarz look alike from [the rear] position," if credited, would also raise a question as to the reliability of Louima's identification of "the driver" as the second participant in his assault, given that Louima's view of "the driver" was from the rear seat of the patrol car.

6. Rule 33 of the Federal Rules of Criminal Procedure provides in relevant part:

On a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require.... A motion for new trial based on newly discovered evidence may be made only within three years after the verdict or finding of guilty. But if an appeal is pending, the court may grant the motion only on remand of the case.

could file a Rule 33 motion based on new material that suggested that the Government may have violated its obligations under *Brady)*. In the interests of judicial economy, we therefore believe that the District Court should consider appellants' *Brady/Giglio* claim-along with any Rule 33 motion that appellants may file-with respect to both trials before we rule on any of appellants' claims of error. In assessing the *Brady/Giglio* claim and ruling on any possible Rule 33 motion, the District Court should permit any necessary supplementation of the record and should explicate the factual findings and legal determinations on which its conclusions are based. In doing so, the District Court will not only enhance our ability to assess appellants' claims, but will also help to avoid piecemeal litigation.

Accordingly, we remand the cause to the District Court for the limited purpose of having it consider, in light of the materials now of record, the *Brady/Giglio* claim now pending before us and any Rule 33 motion that appellants may file. *See United States v. Brawer*, 482 F.2d 117, 136 (2d Cir.1973) (remanding for a similar hearing). *See generally United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir.1994) (describing the practice of remanding for supplementation of the record). In making its determinations, the District Court shall modify our protective orders, *see United States v. Volpe*, No. 00–1479 ¶¶ 4–5 (2d Cir. July 6, 2001) (protective order); *United States v. Volpe*, No. 00–1479 (2d Cir. July 18, 2001) (sealed order), as it deems appropriate and consistent with applicable law. The District Court may make its determinations under a schedule and under procedures that it deems appropriate; however, we direct the District Court to conduct an appropriate evidentiary hearing and complete its consideration and disposition of these matters by no later than September 24, 2001, on which

date our mandate shall automatically be recalled and these appeals reinstated before this panel. *See Jacobson*, 15 F.3d at 22 (providing for the automatic restoration of appellate jurisdiction).

Following the recall of the mandate, the Government and appellants shall file with us supplemental briefs with respect to the District Court's determinations by no later than October 5, 2001, on which date this appeal shall be deemed re-submitted to this panel for its consideration.

In taking the actions outlined above, we intimate no view on the merits of the *Brady/Giglio* claim to be considered by the District Court, or, for that matter, on any of the other claims asserted in these appeals.

The mandate shall issue forthwith.