Faiz SHABAZZ, Petitioner–Appellant,

v.

Christopher ARTUZ, Supt. Green Haven Cor. Fac., Respondent–Appellee.

Docket No. 02–2320.

United States Court of Appeals, Second Circuit.

Argued: March 4, 2003.

Decided: July 18, 2003.

Robert J. Boyle, New York, New York for Petitioner–Appellant Faiz Shabazz.

Diane R. Eisner, Assistant District Attorney, Kings County District Attorney's Office (Charles J. Hynes, District Attorney, Leonard Joblove and Jane S. Meyers, Assistant District Attorneys, on the brief), Brooklyn, New York for Respondent–Appellee Christopher Artuz.

Before: McLAUGHLIN, JACOBS, POOLER, Circuit Judges.

POOLER, Circuit Judge.

Faiz Shabazz ("petitioner") appeals from the April 29, 2002 order of the United States District Court for the Eastern District of New York (Sterling Johnson, Jr., *District Judge* ) denying his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The district court granted a certificate of appealability to examine whether the state court erred in holding that the Kings County District Attorney's Office violated petitioner's rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by 1) promising three prosecution witnesses leniency in their pending criminal cases in exchange for their testimony at petitioner's trial without disclosing these alleged promises to petitioner; and 2) allowing witnesses to testify falsely concerning the nature of their plea agreements and/or their expectations of receiving favorable treatment in exchange for their testimony. We find no basis to disturb the state court's factual finding that the Kings County District Attorney's Office made no undisclosed promises to Florence Boone, Louis Landers, or Sylvia Pullum. We also find no evidence that Landers and Pullum committed perjury when they testified that they had no expectation of favorable treatment or, if they did, that the Kings County District Attorney's Office knew or should have known about their perjury. Accordingly, we affirm the district court's decision.

## BACKGROUND

On January 13, 1983, at approximately 10:15 p.m., Florence Boone and a woman known as "Candy" went to the apartment of Van Adams Troutman to purchase narcotics while petitioner waited with Chester Turner and a man known as "Tango"

downstairs in a parked automobile. Louis Landers and Sylvia Pullum were among those present in the apartment. After purchasing narcotics and meeting petitioner at his car, Boone and Candy returned to the apartment under the pretense of needing to use the restroom. Boone and Candy went into the restroom and exited shortly thereafter, at which time Boone drew a gun and announced that she intended to rob the apartment. After Troutman pushed Candy, Boone shot and killed him.[1] Petitioner and Turner then entered the apartment, collected the money and narcotics, and fled with Boone and Candy.

Petitioner was arrested on February 9, 1983. The next day, Landers and Pullum identified petitioner from a lineup. Boone was also arrested, but the Kings County District Attorney's Office ("District Attorney's Office") agreed to recommend a term of incarceration of eight and one-third to twenty-five years if she pleaded guilty to a reduced charge and testified truthfully against petitioner. Boone accepted the plea arrangement. At her plea allocution, which occurred prior to petitioner's trial, Boone told the court that she received the gun from Candy.

On March 5, 1983, Landers and Pullum were arrested and charged with various narcotics offenses. Both refused the District Attorney's Office's initial plea offer to recommend sentences of one to three years imprisonment. However, the court released Landers and Pullum on their own recognizance and said, "I understand there is some possibility that you may be getting some kind of break. If you don't come back to court, you won't get the break." The court subsequently issued bench warrants for their arrests after they failed to

---

**1.** There was conflicting testimony at trial about whether the shooting was intentional or accidental.

make their court appearances. In the process of executing the bench warrants, police discovered Landers and Pullum in possession of controlled substances, drug paraphernalia, and stolen credit cards. Accordingly, they were charged with additional offenses. At the time of petitioner's trial, both Landers and Pullum were incarcerated while awaiting trial for their own offenses.

Petitioner's trial began on April 9, 1984. Boone testified that she had agreed with petitioner to participate in the robbery and that petitioner had provided her with the gun. In his opening statement, then-Assistant District Attorney Christopher Ulrich informed the jury that Boone had been promised the maximum sentence of eight and one-third to twenty-five years imprisonment if she pleaded guilty to Manslaughter in the First Degree and testified truthfully at petitioner's trial. Boone admitted during her testimony that she cooperated with the District Attorney's Office in order to receive the more lenient sentence associated with the charge of Manslaughter in the First Degree. Boone also testified that she expected to receive the maximum penalty associated with that charge.

Landers and Pullum identified petitioner as one of the two men who entered the apartment after the shooting. Both witnesses testified that the District Attorney's Office had not promised them leniency with respect to their pending cases in exchange for their testimony. Landers and Pullum also testified that they did not expect to receive a benefit by virtue of their testimony against petitioner.

On cross-examination, the three witnesses admitted to having serious drug habits. Landers and Boone testified that they were under the influence of narcotics when the shooting occurred. Landers and Pullum testified that they had taken cocaine and heroin the night they identified petitioner in the lineup. Landers testified that he initially lied to the police about his whereabouts at the time of the shooting. Moreover, Landers and Pullum testified to other facts that called into question the reliability of their eyewitness identifications. Landers admitted that, after identifying petitioner in the lineup, he recanted his identification and then reversed his recantation. Pullum testified that she could not identify petitioner from a photograph shortly after the incident. However, Pullum testified that she was able to identify petitioner from the lineup approximately one month later.

The jury convicted petitioner on April 12, 1984, and the court sentenced him to a term of twenty-two years to life imprisonment. Four days after petitioner was convicted, the District Attorney's Office recommended that the court release Landers and Pullum from custody on their own recognizance. Shortly afterwards, Landers pleaded guilty to his pending charges, and the judge noted that Landers had "made a lot of [deals] here." Ulrich, who also prosecuted petitioner, recommended a sentence of sixty days imprisonment. As Landers had already served seventy-seven days in prison, the court sentenced him to time served plus five years probation. Pullum also pleaded guilty. After consulting Ulrich, the assistant district attorney prosecuting Pullum's case recommended an unconditional discharge, and the sentencing court accepted the recommendation.

Boone was sentenced on September 4, 1984. Although her plea agreement provided for a sentence of eight and one-third to twenty-five years imprisonment, the sentencing court stated that a term of seven to twenty-one years of imprisonment would be fair and asked the District Attorney's Office to consent to the lesser sen-

tence. Ulrich informed the court that Boone was not entitled to the reduction, but acceded to the court's request.

After exhausting his direct appeals, petitioner filed a motion in state court to vacate the judgment of conviction and dismiss the indictment, pursuant to New York Criminal Procedure Law § 440.10. Petitioner argued that the District Attorney's Office made undisclosed promises of leniency to Boone, Landers, and Pullum in exchange for their testimony. Petitioner also argued that Landers and Pullum committed perjury when they testified that they received no promises of leniency and expected no benefits as a result of their cooperation, and that Ulrich knew or should have known about this alleged perjury.

New York Supreme Court Justice Ruth Moskowitz, who presided over petitioner's trial, conducted an evidentiary hearing on June 26, 1992. Ulrich testified that the only promise he made to Boone was to recommend a sentence of eight and one-third to twenty-five years imprisonment. Ulrich testified that he may have recommended leniency for Landers and Pullum based upon their truthful testimony against petitioner. However, Ulrich testified that he made no promises to Landers or Pullum concerning their pending cases prior to their testimony at petitioner's trial.

The state court issued a comprehensive written order denying petitioner's motion on December 11, 1992. The state court found that the District Attorney's Office had made no undisclosed promises of leniency to Boone. Although Boone received a sentence that was different from the one provided by the plea agreement, the court found that the issue arose for the first time at Boone's sentencing and that the District Attorney's Office had not requested additional leniency on her behalf.

The state court also found that while Landers and Pullum received favorable treatment due to their cooperation, there was nothing to suggest that the District Attorney's Office procured their testimony by promising them leniency with respect to their pending criminal cases. The court accepted the truth of Ulrich's testimony and concluded that the judges's references to "breaks" and "deals" were insufficient to establish that the District Attorney's Office had made actual promises of leniency. The state court concluded that, "[i]n all likelihood," the judges simply assumed that Landers and Pullum had agreed to cooperate with the District Attorney's Office in exchange for lenient sentences.

After the New York Supreme Court, Appellate Division, Second Department denied petitioner leave to appeal on July 12, 1993, petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Eastern District of New York on April 8, 1997. Petitioner initially argued that 1) the prosecution failed to prove his guilt beyond a reasonable doubt; 2) the trial court improperly denied his motion to suppress Landers's and Pullum's identification; 3) the prosecution failed to disclose that two of its witnesses would receive favorable treatment in pending cases in exchange for their testimony; and 4) the prosecution knowingly used perjured testimony of cooperating witnesses. The district court dismissed the petition as time-barred, but this Court vacated the dismissal and remanded the case on September 22, 1998. On remand, Petitioner withdrew the first and second grounds for his petition. Petitioner also filed a memorandum of law alleging that "(1) [he] has established by clear and convincing evidence that pretrial deals existed with Landers, Pullum, and Boone [and that] the state court's decision was an unreasonable appli-

cation of Supreme Court precedent; and (2) the prosecution's failure to disclose promises to its three chief witnesses requires that the petition be granted." On August 2, 2001, U.S. Magistrate Judge Lois Bloom issued a report and recommendation recommending that the district court deny petitioner's claims. The district court denied the petition on April 29, 2002 and granted a certificate of appealability on May 15, 2002.

## LEGAL STANDARDS

### I. The Issues on Appeal

■ At the outset, we specify which issues are properly part of this appeal. Petitioner requested a certificate of appealability by submitting a letter to the district court requesting the right to appeal the court's ruling on his "*Brady/Giglio* claim." The district court simply wrote on the letter: "Petitioner's request that this Court issue a certificate of appealability pursuant to 28 U.S.C. [§ ] 2253 is GRANTED."

We will consider only whether the state court erred in holding that the District Attorney's Office violated petitioner's rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by 1) promising three prosecution witnesses leniency in their pending criminal cases in exchange for their testimony at petitioner's trial without disclosing these alleged promises to petitioner; and 2) allowing three witnesses to testify falsely concerning the nature of their plea agreements and/or their expectations of receiving favorable treatment in exchange for their testimony. Petitioner raised these issues before the state court, appealed the state court's ruling to the Appellate Division, and asserted the same issues in the instant habeas petition.

Petitioner's brief on appeal to this court, however, could be interpreted to assert additional claims. Petitioner alleges that the District Attorney's Office failed to disclose that Boone testified at her plea allocution that Candy, rather than petitioner, gave her the gun that she used to shoot Troutman. Petitioner argues that "[t]his statement is exculpatory since the prosecution maintained that it was appellant who master-minded the robbery." Petitioner also argues that Boone's testimony at her plea allocution was "impeachment material," as it was "inconsistent" with her subsequent testimony at trial, that petitioner gave her the gun. Thus, petitioner asserts a *Brady* claim based upon the District Attorney's Office's alleged failure to make available the transcript of Boone's plea allocution.

Petitioner also asserts a *Brady* claim based upon allegations that the District Attorney's Office knowingly allowed Pullum to testify falsely that 1) she was innocent with respect to the charges pending against her; 2) she declined an offer of "one year probation;" 3) she did not know that the pending charges against her carried a maximum term of twenty-five years imprisonment; and 4) the judge in her case was unaware that she was a cooperating witness in the case against petitioner.

Finally, Petitioner asserts a *Brady* claim based upon the District Attorney's Office's alleged failure to disclose the state courts's references to Landers and Pullum receiving "breaks" or "deals." While petitioner uses this comment to attempt to demonstrate clear error with respect to the state court's finding that there were no undisclosed promises, he also argues that the District Attorney's Office had an obligation to disclose these comments under *Gordon v. United States*, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953). In that case, the Supreme Court held that the jury should

have heard that the district court, while accepting the guilty plea of a defendant who subsequently testified against his co-conspirators, suggested that the defendant should demonstrate that he had cooperated with law enforcement. *Id.* at 422, 73 S.Ct. 369. Petitioner argues that, as in *Gordon,* Landers and Pullum were informed prior to his trial that they may receive a "break," and, thus, his "jury was entitled to weigh what effect those words had on them when determining their credibility."

Although this Court has the authority to amend a certificate of appealability, *see Cotto v. Herbert,* 331 F.3d 217, 236–237 (2d Cir.2003), we decline to consider petitioner's additional claims, as he failed to raise them before the district court. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). While petitioner cited *Gordon* in his objections to Judge Bloom's report and recommendation, he did so in the context of arguing that "the prosecution cannot avoid its duty to disclose by keeping its promises to a witness general," citing *DuBose v. Lefevre,* 619 F.2d 973 (2d Cir.1980), which he claimed was "a logical application of existing Supreme Court precedent announced in *Gordon v. United States,* 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953)." Even were we to interpret petitioner's reference to *Gordon* as an assertion of a *Brady* claim based upon the District Attorney's Office's failure to disclose the courts's comments, petitioner did not exhaust his state remedies with respect to this claim or his additional claims. "If anything is settled in habeas corpus jurisprudence, it is that a federal court may not grant the habeas petition of a state prisoner unless it appears that the applicant has exhausted the remedies available in the courts of the State . . . ." *Aparicio v. Artuz,* 269 F.3d 78, 89 (2d Cir.2001) (citing 28 U.S.C.

§ 2254(b)(1)) (internal quotation marks omitted).

■ Accordingly, we decline to consider additional issues that are predicated upon stray allegations in petitioner's brief. It would be helpful when a district court grants a certificate of appealability, if it would issue a separate order that states with specificity the issues it intends to certify for appeal to this Court. *Cf.* 28 U.S.C. § 2253(c)(3) ("The certificate of appealability . . . shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2).").

## II. The Deferential Standard of 28 U.S.C. § 2254

■ We review a district court's denial of a petition for a writ of habeas corpus de novo. *See Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,* 537 U.S. 909, 123 S.Ct. 251, 154 L.Ed.2d 187 (2002). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2254, the standard governing federal habeas review depends upon whether the petitioner's claims have been previously "adjudicated on the merits" by a state court. *Cotto,* 331 F.3d at *229. We have held that a state court "adjudicates" a petitioner's federal constitutional claims "on the merits" when it states that it is disposing of the claims on the merits and reduces its disposition to judgment. *Id.; see also Ryan v. Miller,* 303 F.3d 231, 246 (2d Cir.2002). In the instant case, Justice Moskowitz addressed the merits of petitioner's claims while making detailed findings of facts and conclusions of law. The court also reduced its judgment to a comprehensive written order. As the state court adjudicated petitioner's claims "on the merits," we apply the deferential standard of review pre-

scribed by AEDPA.[2] Specifically, the statute provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has interpreted 28 U.S.C. § 2254(d)(1) as giving independent meaning to both the "contrary to" and "unreasonable application" clauses. *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to" Supreme Court precedent if it 1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or 2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result. *Id.* at 405, 120 S.Ct. 1495. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Moreover, "clearly established Federal law, as determined by the Supreme Court," refers to the "holdings, as opposed to the dicta, of [the] Court's

decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495.

Whether cooperation agreements exist between the prosecution and its witnesses is a factual determination. *See, e.g., Wedra v. Thomas*, 671 F.2d 713, 717 (2d Cir.1982). "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." *Id.; see also McKinney v. Artuz*, 326 F.3d 87, 101 (2d Cir.2003) (citations omitted). This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility. *See Cotto*, 331 F.3d at *233–34; see also Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1040–41, 154 L.Ed.2d 931 (2003). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review .... A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller–El*, 123 S.Ct. at 1041. In sum, "[d]eference does not by definition preclude relief." *Id.*

### III. *Brady v. Maryland*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under

---

**2.** If a state court has not adjudicated the claim "on the merits," we apply the pre-AEDPA standards, and review de novo the

state court disposition of the petitioner's federal constitutional claims. *Aparicio*, 269 F.3d at 93.

*Brady* and its progeny, the government has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant either because it is exculpatory or because it can serve to impeach a key witness. *See Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Impeachment evidence includes promises that the prosecution makes to key witnesses in exchange for their testimony. *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

"In order for evidence to be 'material' within the meaning of *Brady,* a defendant does not need to show that the evidence, if disclosed, would have resulted in his acquittal; rather, he needs to show only that the evidence could 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Schwarz,* 259 F.3d 59, 64 (2d Cir.2001) (per curiam) (quoting *Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555). The Supreme Court has identified three distinct situations in which a *Brady* claim might arise: "first, where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured; second, where the Government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence; and third, where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way." *Kyles,* 514 U.S. at 433, 115 S.Ct. 1555 (internal citations omitted).

### DISCUSSION

### I. Boone

██ Petitioner does not dispute that the District Attorney's Office disclosed that Boone pleaded guilty to Manslaughter in the First Degree and was promised a sentence of eight and one-third to twenty-five years imprisonment in exchange for her cooperation. Instead, Petitioner argues that the District Attorney's Office made an additional undisclosed promise of leniency to Boone based upon the fact that the court actually sentenced her to a term of imprisonment that was more lenient than the one provided by the plea agreement.

Petitioner's argument is meritless. The state court found that there was no discussion of a lesser sentence for Boone until her sentencing, which occurred approximately five months after she testified in petitioner's case. The state court also found that the District Attorney's Office did not request leniency on behalf of Boone. Rather, the state court found that the sentencing court suggested that a term of imprisonment of seven to twenty-one years would be fair and asked Ulrich to consent to the lesser sentence. Our own review of the record indicates that Boone's counsel initially requested a reduced sentence without the District Attorney's Office's assistance or consent.

Petitioner proffers no evidence of any undisclosed promises between the District Attorney's Office and Boone. Petitioner argues that Ulrich consented to the lenient sentence in light of Boone's cooperation. This may be true. However, the issue is not whether Boone eventually received favorable treatment because she testified at petitioner's trial. The relevant inquiry is whether the District Attorney's Office made an undisclosed promise of additional leniency in exchange for Boone's cooperation. Contrary to petitioner's argument, the mere fact that Ulrich acceded to the sentencing court's request does not provide sufficient evidence of any such promise.

Petitioner offers no evidence demonstrating that the state court's findings of fact are clearly erroneous. Upon reviewing the record, we conclude that they are, in fact, correct. We also note that, while Ulrich consented to the sentencing court's request, he informed the court that Boone was "not entitled to the reduction." Accordingly, petitioner's application for a writ of habeas corpus on this ground is denied.[3]

## II. Landers and Pullum

### A. The Alleged Existence of Undisclosed Promises of Leniency

Petitioner argues that the District Attorney's Office made undisclosed promises of leniency to Landers and Pullum with respect to their pending criminal cases in exchange for their testimony at his trial. However, Petitioner cites insufficient evidence to disturb the trial court's factual finding that the District Attorney's Office made no such promises to Landers and Pullum.

 Christopher Ulrich, who prosecuted petitioner's case, testified at the state court's evidentiary hearing on petitioner's motion for post-conviction relief under New York Criminal Procedure Law § 440.10. Ulrich testified that he made no promises to Landers and Pullum in exchange for their testimony. In fact, Ulrich testified that he explicitly informed Landers and Pullum that "there would be no promises" with respect to the dispositions of their pending cases. Justice Moskowitz, who also presided over petitioner's criminal trial, accepted the truth of Ulrich's testimony. Credibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing. *See Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *United States v. Yousef,* 327 F.3d 56, 124 (2d Cir.2003). While "[d]eference does not by definition preclude relief," *Miller–El,* 123 S.Ct. at 1041, we see no basis for finding that the state court clearly erred by accepting Ulrich's testimony.

Petitioner also relies upon the fact that Landers's and Pullum's criminal cases were repeatedly adjourned until after his trial. While the "Case Status and Action Reports" reveal that the District Attorney's Office intended to dispose of these cases after Landers and Pullum testified at petitioner's trial, the adjournments themselves do not evidence that the District Attorney's Office promised these witnesses leniency in exchange for their cooperation, as both sides had independent incentives to resolve these cases after petitioner's trial.

Landers's and Pullum's attorneys had an interest in seeking the adjournments so that they could argue at sentencing that their clients' cooperation warranted leniency. Attorney Barry Weiss, who represented Pullum, testified before the state court that it was his practice to bring to the court's attention any information that would assist his client in obtaining a favorable disposition, which would presumably include cooperation with the District Attorney's Office. The witnesses' "general and hopeful expectation of leniency is not enough to create an agreement or an understanding" that they would, in fact, receive leniency in exchange for their testimony. *Collier v. Davis,* 301 F.3d 843, 849 (7th Cir.2002), *cert. denied,* —— U.S. ——,

---

**3.** To the extent petitioner alleges that the District Attorney's Office violated *Brady* by allowing Boone to testify falsely concerning the nature of her plea agreement, we reject this argument, as the state court's finding that there were no undisclosed additional promises of leniency is not clearly erroneous.

123 S.Ct. 1290, 154 L.Ed.2d 1054 (2003); *see also Hill v. Johnson,* 210 F.3d 481, 486 & n. 1 (5th Cir.2000) (stating that only "an express agreement between the [s]tate and a witness," not "a witness'[s] 'nebulous expectation of help from the state,'" constitutes *Brady* material); *Mastrian v. McManus,* 554 F.2d 813, 823 (8th Cir.1977) (declining to read *Giglio* "to support [the] claim that a crucial witness's expectation of leniency must be revealed absent evidence of an express or implied promise").

At the same time, the District Attorney's Office had an incentive to delay the disposition of these cases in order to ensure Landers's and Pullum's continued cooperation. The existence of a pending prosecution against a government witness provides an inherent incentive for cooperation, and this incentive—namely the pending charges against both Landers and Pullum—was disclosed to petitioner.[4] Given that they had failed to make their own court appearances, the District Attorney's Office could reasonably have been concerned that Landers and Pullum, whose testimony was critical, may fail to appear at petitioner's trial, absent the implicit threat posed by their own impending prosecutions. While the District Attorney's Office's desire to adjourn Landers's and Pullum's cases may have given the impression that they would receive favorable treatment in exchange for their testimony, the adjournments themselves do not evidence an agreement. This is especially true in light of Ulrich's testimony—which the state court accepted as true—that he explicitly informed both Landers and Pullum that he would not promise them anything with respect to their pending cases

in exchange for their testimony against petitioner.

Petitioner relies upon comments of the state court judges presiding over Landers's and Pullum's cases, as well as notations in the defendants' case files.[5] Specifically, Justice Feldman, who presided over Landers's and Pullum's cases, said during a pre-trial hearing, "I understand there is some possibility that you may be getting some kind of break." The judge who took Landers's plea noted that Landers had "made a lot of [deals] here." Petitioner also relies upon the fact that the prosecutors handling these cases repeatedly told the judges that both defendants were cooperating witnesses in a homicide investigation. However, the state court found that there were no promises of leniency and that the judges merely assumed that Landers and Pullum were subject to plea agreements. We see no reason to disregard this finding of fact, as there is no evidence that the District Attorney's Office ever represented to the court that Landers and Pullum would receive leniency in exchange for their testimony. Rather, the record reflects that the District Attorney's Office informed the court that Landers and Pullum were cooperating in petitioner's case to justify the adjournments.

Finally, Petitioner attempts to establish that the District Attorney's Office promised Landers and Pullum leniency in exchange for their testimony by virtue of the fact that both actually received favorable treatment. Petitioner points out that, prior to his trial, both Landers and Pullum were initially released on their own recog-

---

**4.** While we acknowledge that both Landers and Pullum identified petitioner from a police lineup prior to their initial arrests, we recognize that the District Attorney's Office had an incentive to ensure the witnesses's continued cooperation.

**5.** Petitioner concedes that the notation in the District Attorney's Office's case files amending Landers's and Pullum's initial plea offers of one to three years imprisonment was made after petitioner was convicted.

nizance. However, the District Attorney's Office opposed Landers's request for release on his own recognizance. The District Attorney's Office was also "opposed to any reduction in [Landers's] bail," which had been set at $1,500. The fact that the District Attorney's Office did not intervene when Landers and Pullum were arrested on bench warrants and charged with additional offenses, both of which occurred prior to their testimony, belies the existence of an arrangement between the District Attorney's Office and the witnesses.

Petitioner also emphasizes that Landers and Pullum received favorable treatment after they testified. Both were released from incarceration on their own recognizance shortly after petitioner was convicted. They also received favorable dispositions of their criminal cases. Landers pleaded guilty and received a sentence of time served and five years probation. Pullum also pleaded guilty and received an unconditional discharge. The record supports petitioner's contention that Landers and Pullum received favorable treatment because of their cooperation. However, the state court accepted Ulrich's explanation that he may have made sentencing recommendations in Landers's and Pullum's cases "in light of their truthful testimony against the defendant." The district court, in evaluating the state court's findings of fact, concluded that "the record reflects that the District Attorney afforded Landers and Pullum special attention and consideration." Indeed, the conclusion that Landers and Pullum received favorable treatment because of their cooperation is inescapable. Ulrich—the same assistant district attorney who prosecuted petitioner's case—monitored Landers's and Pullum's cases. Ulrich appeared at Landers's sentencing and recommended the lenient sentence because he believed

that "[i]f the person had testified truthfully, ... they deserved some sort of break on their case." Ulrich also approved the District Attorney's Office's recommendation concerning Pullum's lenient sentence.

 Thus, petitioner is correct that Landers and Pullum received a benefit because they testified against him. However, this fact, standing alone, does not establish that, prior to petitioner's trial, the District Attorney's Office promised Landers and Pullum leniency. The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony. That is not to say that a prosecutor may circumvent his *Brady* obligations by failing to reduce to writing a plea agreement or a promise of leniency. Nor may a prosecutor avoid his duty of disclosure by phrasing a promise of favorable treatment in general terms. *See DuBose v. Lefevre*, 619 F.2d 973, 979 (2d Cir.1980) ("The prosecution cannot, by keeping its promises of consideration to a witness general in language or tone, escape the fact that it gives the witness reason to believe that his or her testimony will lead to favorable treatment by the State. Unquestionably, agreements in general terms to reward testimony by consideration create an incentive on the witness'[s] part to testify favorably to the State and the existence of such an understanding is important for purposes of impeachment."). We hold only that the fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.[6]

---

6. At the same time, however, the fact that a witness actually received favorable treatment

## B. The District Attorney's Office's Use of Allegedly Perjured Testimony

■ As a separate but related issue, petitioner argues that the District Attorney's Office violated *Brady* by allowing Landers and Pullum to testify falsely that they received no promises of leniency in exchange for their testimony. This argument fails, as petitioner cannot establish that the state court's finding that there were no such undisclosed promises was clearly erroneous.

Petitioner also argues that the District Attorney's Office violated *Brady* by allowing Landers and Pullum to testify falsely that they did not expect to receive a benefit in exchange for their testimony. However, the facts of this case do not suggest that the District Attorney's Office knew or should have known that either witness expected to receive favorable treatment. While Landers's and Pullum's attorneys may have intended to request leniency based upon their clients's cooperation, any intentions to seek leniency or hopes of receiving it do not translate into an expectation that they would, in fact, receive favorable treatment from the District Attorney's Office. More important, however, there is no evidence that either Landers or Pullum made known to the District Attorney's Office any expectations that they might receive leniency in exchange for their testimony.

Justice Feldman's comment that Landers and Pullum may receive a "break" does not prove that the District Attorney's Office knew or should have known that the witnesses expected to receive favorable treatment. Even were we to accept petitioner's argument that Landers and Pullum expected leniency because of the judge's comment, it necessarily follows that they thought they had lost their "break" by failing to make their court appearances. Justice Feldman explicitly told Landers, in Pullum's presence, "If you don't come back to court, you won't get the break." Landers and Pullum subsequently failed to appear for their April 4, 1984 court appearances and were arrested prior to testifying at petitioner's trial, which began on April 9, 1984. Thus, the state court's references to a "break" do not evidence that Landers and Pullum falsely testified that they did not expect to receive leniency, or more important, that the District Attorney's Office knew or should have known about this alleged perjury. For these reasons, we reject Petitioner's *Brady* claim on this ground.

## C. The Materiality of the Allegedly Undisclosed Information

■ Petitioner also fails to demonstrate that the allegedly undisclosed information was material. "[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir.1998); *see also Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.").

may be relevant in establishing the existence of undisclosed promises of leniency when considered with other facts—not present in this case—such as a state court's finding that the prosecutor's account was not credible.

We note that petitioner extensively attacked the witnesses' credibility at trial. On cross-examination, Landers and Pullum admitted to having serious drug habits. Landers testified that he was under the influence of narcotics when the shooting occurred, and both Landers and Pullum took cocaine and heroin the night they identified petitioner in the lineup. Landers also admitted that he initially lied about his whereabouts at the time of the shooting.

Therefore, we conclude that the allegedly undisclosed material would not have been material as impeachment evidence. The government need not disclose evidence that, while "possibly useful to the defense," *Giglio*, 405 U.S. at 154, 92 S.Ct. 763, is immaterial.

## CONCLUSION

This case is troubling in the sense that the circumstances surrounding the dispositions of Louis Landers's and Sylvia Pullum's criminal cases raise serious questions. The record seems clear that both received favorable treatment because they testified against petitioner. However, the relevant inquiry is whether the Kings County District Attorney's Office procured the cooperation of Boone, Landers, or Pullum by making undisclosed promises of leniency. The state court judge who presided over both the trial and the evidentiary hearing on petitioner's state postconviction motion for relief issued a comprehensive written order that clearly delineated her findings of fact that there were no undisclosed promises or expectations of leniency. Regardless of our own interpretations of the record, we cannot disturb these findings unless they are clearly erroneous, and petitioner proffers insufficient evidence to support such a finding in this case.

Based upon the foregoing, the judgment of the United States District Court for the Eastern District of New York is affirmed.