**James R. PINE, Petitioner,**

v.

**SUPERINTENDENT, GREEN HAVEN CORRECTIONAL FACILITY, Respondent.**

No. 9:13–CV–1458.

United States District Court, N.D. New York.

Signed May 1, 2015.

Danielle Neroni, Esq., Office of Danielle Neroni, Albany, NY, for Petitioner.

Thomas B. Litsky, Esq., Ass't Attorney General, Eric T. Schneiderman, New York State Attorney General, New York, NY, for Respondent.

## DECISION and ORDER

DAVID N. HURD, District Judge.

## I. INTRODUCTION

Petitioner James R. Pine seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2008 judgment in Green County Court convicting him, upon a jury verdict, of manslaughter in the first degree (N.Y. Penal Law ("Penal Law") former § 125.20(1)) and assault in the first degree (Penal Law § 120.10(1)). Dkt. No. 1, Petition ("Pet."). Respondent filed a response to the petition and pertinent records from the state court proceedings. Dkt. No. 8–1, Respondent's Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus ("R. Mem."); Dkt. Nos. 10–11, State Court Records. Also pending is petitioner's motion for "post conviction bail" pending the resolution of his petition. Dkt. No. 13, Motion for Bail Pending Appeal.

For the reasons that follow, petitioner's motion will be denied and the petition will be denied and dismissed.

## II. RELEVANT BACKGROUND

The following background information is derived from the state court records. Petitioner was charged with first degree manslaughter and first degree assault following an incident on October 31, 2006, in which he and his codefendant, Michael Deyo ("Deyo"), attacked Michael Formichelli ("the victim"), who later died as a result of his injuries. See Dkt. No. 10 at

188–189, Indictment.[1] On July 25, 2007, Deyo pleaded guilty to first degree assault, the only crime with which he was charged for his role in the incident. Dkt. No. 10–2 at 617, 651, Transcript of Plea Proceeding of Michael Deyo. At the proceeding, Deyo's counsel noted that he was entering a plea "without a plea bargain agreement or sentencing recommendation from" the district attorney. Id. at 622. Deyo acknowledged that he understood the range of possible sentences that might be imposed upon his guilty plea, and that the court would not commit to any particular sentence. Id. at 630–632. Counsel reiterated that "[n]o promises whatsoever have been made with respect to the sentence that the Court will impose[,]" and the district attorney stated his understanding that the prosecution would "be permitted to argue in favor of anything that it deems appropriate at the appropriate time." Id. at 632–633.

Deyo admitted that he was acting in concert with petitioner when he and petitioner pursued the victim down a road, confronted him, and petitioner struck the victim in the head with a metal pipe. Id. at 648–650. Deyo's sentencing was scheduled to be held after petitioner's jury trial. Id. at 654.[2] A copy of the transcript of Deyo's plea proceeding was provided to petitioner before the prosecution called its first trial witness. See Dkt. No. 11–1 at 458, Trial Transcript.[3]

---

1. Citations to the state court records at Docket Numbers 10 through 10–3 refer to the consecutive Bates-stamped pagination, prefixed "SR," found at the top center of the pages of those records.

2. Deyo was ultimately sentenced to a term of eight years imprisonment and five years post-release supervision. Dkt. No. 10–3 at 858, Transcript of Sentencing of Michael Deyo. At Deyo's sentencing, the district attorney acknowledged that Deyo had supplied "very im-

portant testimony" at petitioner's trial, but did not recommend any particular sentence. Dkt. No. 10–3 at 850.

3. Citations to the transcripts of state court proceedings, contained in Docket Numbers 11 through 11–5, refer to the original, consecutive pagination of the transcript. The trial transcript begins in Docket Number 11 at page 173 of the pagination provided by the court's electronic filing system, CM/ECF.

Petitioner's trial was held in December 2007, and Deyo testified on behalf of the prosecution. Dkt. No. 11–2 at 463; Dkt. No. 11–4 at 1066. Deyo stated that he had been made "[n]o promise at all" with regard to his sentencing exposure on his guilty plea or the district attorney's sentencing recommendation. Dkt. No. 11–4 at 1067. He was "good friends" with petitioner until the date of the incident, and was with petitioner leading up to the altercation at issue. *Id.* at 1071, 1075. On October 31, 2006, petitioner asked Deyo to help him tow petitioner's grandfather's car. Deyo agreed and went to 5 Mile Wood Road in Catskill, where petitioner resided with his parents. *Id.* at 1076. Thereafter, petitioner and Deyo went to petitioner's grandfather's house and retrieved his car. Petitioner towed the car with his own vehicle, a Lincoln, and Deyo steered the car being towed. *Id.* at 1076–1077.

During the drive, Deyo observed petitioner talking on his cell phone and noticed that he began to drive faster. Dkt. No. 11–4 at 1078–1079. Upon arriving at petitioner's residence, the two men unhooked the vehicle being towed and petitioner retrieved an object resembling a "pipe" from the garage and threw it in the backseat of his own car. *Id.* at 10791080. Petitioner told Deyo that they "need[ed] to go to Catskill." *Id.* at 1080. The men got into petitioner's vehicle and, en route, petitioner explained that he received a phone call from the home phone of Mary Seeley ("Seeley"), who petitioner knew to be out with her children. *Id.* Seeley was petitioner's girlfriend at the time. *Id.* at 1073–1074. Petitioner appeared "[a]ggravated" and drove "faster and faster." *Id.* at 1080.

Petitioner drove to Seeley's apartment building at 196 Dubois Road in Catskill, exited the vehicle, and approached "some kids" in the parking area. Dkt. No. 11–4 at 1081. Petitioner indicated he was looking for "Mike," and the individuals replied that they were not Mike. *Id.* at 1081. Petitioner and Deyo went inside the building and approached Seeley's upstairs apartment, and found the door slightly open. *Id.* at 1082. They entered and saw the victim in the bathroom. *Id.* at 1082. Petitioner asked the victim why he was there, and the victim stated that his girlfriend lived there. The victim then "charged" toward petitioner and Deyo, initiating a scuffle as the three men exited the apartment and "tumbled down the stairs to the first landing." *Id.* at 1082–1083. The struggle continued and Deyo "hit [the victim] two or three times" before petitioner returned to his feet and they "all tumbled down the next set of stairs." *Id.* at 1083.

The men got to their feet and exited the apartment building. Dkt. No. 11–4 at 10831084. The victim shouted that he was "going to go to Hudson [and] get his guys" and that he had a gun in his car. *Id.* at 1084. Deyo told the victim that he needed "to leave before there's any more problems" and that the police were on the way. *Id.* Deyo and the victim continued shouting at each other as the victim walked up the driveway toward the road, and then began running. *Id.* at 1085–1086. Petitioner then pulled up to Deyo in his car and told Deyo to get in. *Id.* at 1086–1087.

Petitioner drove in the direction the victim was moving as Deyo told petitioner that the police were on the way and the confrontation "need[ed] to stop right now before there's problems." Dkt. No. 11–4 at 1087. The two came upon the victim, who ran up onto the front lawn of a house located at 15 Abeel Drive. *Id.* at 1087–1088. Petitioner parked near the driveway of the house and both men exited the car. *Id.* at 1087–1088. Deyo "walked around the corner" and called the police from his cell phone. *Id.* at 1089. At the same time, petitioner ran up to the victim,

who was knocking on the door of the house, and "threw [the victim] off the stairs [and] onto the ground." *Id.* When the victim attempted to stand up, petitioner "put him back down on the ground by hitting him or pushing him." *Id.* at 1090.

Deyo's call to the police concluded and he walked toward the area where the victim was laying on the ground and "mumbling." Dkt. No. 11–4 at 1090–1091. Shortly thereafter, 911 called Deyo back and he walked toward the road to answer the call. *Id.* at 1091. Meanwhile, Deyo observed petitioner walk back toward his vehicle and return with "the pipe in his hand." *Id.* As the victim again attempted to get off the ground, petitioner struck him "right in the top of the head" with the pipe. *Id.* at 1091–1092. During his phone calls with the 911 dispatcher, Deyo stated that he had struck the victim and that the police needed to respond quickly because he was "going to end up killing this guy[.]" *Id.* at 1151. Deyo testified that this statement was a "a bad choice of words," and clarified that he had struck the victim at Seeley's apartment. *Id.*

Deyo knocked on the door of the house again, and the homeowner finally answered. Dkt. No. 11–4 at 1093–1094. Deyo attempted to explain the situation, but the homeowner told him "to get off his property." *Id.* at 1094. Deyo "walked down the road," and police vehicles began arriving. *Id.* at 1095–1096. The first officers to respond included the chief of the Catskill Police Department and Officer Ricky Deyo, Deyo's brother. *Id.* at 1094–1095. Thereafter, petitioner and Deyo followed another officer back to Seeley's apartment, which was in a disheveled state. *Id.* at 1095–1096. Petitioner and Deyo then agreed to drive to the police station and provide statements. *Id.* at 1097. The victim was transported to the hospital and later died due to a cerebral edema resulting from his head injuries.

*Id.* at 1199–1203. Deyo expressed his concern with his involvement in the altercation, but petitioner reassured him that they would "not be in trouble" because "the [victim] broke into the house and started to fight." *Id.* at 1097–1098. Deyo provided a written statement to the police, in which he omitted any mention of the pipe because he wanted to protect petitioner. *Id.* at 1098–1099.

Petitioner was placed under arrest. Deyo was not immediately arrested, and returned to petitioner's father's house the following day to help perform mechanical work on a vehicle. Dkt. No. 11–4 at 1104–1105. During his visit, petitioner's brother opened the trunk of the Lincoln and Deyo saw the metal pipe used to strike the victim inside. *Id.* Petitioner's father took the pipe and placed it in the basement. *Id.* at 1105. Later that night, a New York State Police investigator called Deyo and asked him to return to the Catskill Police Department to discuss the incident, and Deyo provided another statement, this time revealing the existence and location of the pipe. *Id.* at 1106–1107. He was then placed under arrest. *Id.* at 1107. Deyo denied possessing or using the pipe during the confrontation with the victim. *Id.* at 1137. He reiterated on cross-examination that he pleaded guilty with "no deal or anything ... worked out" as to the sentence he would receive for his role in the attack. *Id.* at 1147. The pipe was eventually secured from petitioner's father's residence. Dkt. No. 11–3 at 930–931. Subsequent forensic analysis revealed, among other things, the presence of DNA on the pipe matching the victim's DNA. *Id.* at 1045.

Other witnesses from Seeley's apartment complex also testified for the prosecution. On the evening of the incident, Betsy Hollywood ("Ms. Hollywood") was standing outside the building with her boy-

friend, Nicholas Gagner ("Gagner"), when petitioner and Deyo first arrived. Dkt. No. 11–2 at 541–544. Petitioner, who was driving, exited his vehicle, approached, and announced that he was "looking for a guy named Mike." *Id.* at 544, 579. Ms. Hollywood and Gagner denied knowing to whom petitioner was referring, but then went inside to inform Mike Hollywood, ("Mr. Hollywood"), Ms. Hollywood's brother, what had happened. Gagner was concerned that petitioner, who appeared aggravated, was looking for Mr. Hollywood, who rented an apartment in the building. *Id.* at 579–581. Paul Dowd ("Dowd") and Ashley Steenburn ("Steenburn") were also in Mr. Hollywood's apartment. *Id.* at 542, 577, 607, 623–625, 666–667.

The group congregated outside after petitioner and Deyo entered the building. Dkt. No. 11–2 at 548, 583, 607–608, 624–625, 669. Ms. Hollywood and Gagner recalled hearing "[r]umbling" and "commotion" coming from inside, and, shortly thereafter, petitioner emerged, stated that someone had broken into Seeley's apartment, and told Mr. Hollywood to go inside and lock Seeley's door. *Id.* at 549, 583–584, 588, 608, 627–628. Mr. Hollywood did so, and observed that Seeley's apartment was a "mess" inside. *Id.* at 669. Petitioner and Deyo got into the Lincoln and quickly drove up the driveway and out of sight. *Id.* at 550, 586–587, 609, 630–631. Before the vehicle left, Dowd recalled seeing petitioner holding a "broom stick shaped object," and Steenburn also observed "something long" in his hand. *Id.* at 609, 630. Edward Gilson ("Gilson"), another resident at the apartment building, was on his porch when he heard a verbal exchange between a male being followed away from the building by another male. *Id.* at 727, 731–733. The first male then "turned and ran down the road." *Id.* at 737. From his vantage point, Gilson then saw "the backs of two men," and one appeared to be carrying a "baton," holding

it low along his leg. *Id.* at 739. Gilson saw the male with the baton on previous occasions driving a Lincoln. *Id.* at 740.

Gagner and Ms. Hollywood got into Gagner's truck and pursued the Lincoln, and Dowd, Steenburn, and Mr. Hollywood followed in a separate vehicle. Dkt. No. 11–2 at 552553, 567, 588–589, 611, 630–633, 673–674. Both vehicles found the Lincoln parked near a residence on Abeel Drive. When the group arrived, the victim was lying on the ground in front of the house near the porch. *Id.* at 553, 592, 612, 637, 675–676. Ms. Hollywood recalled seeing "someone smacking the guy on the ground" and he was bleeding from the head. *Id.* at 556. Gagner observed that Deyo was talking on his cell phone and petitioner "was standing near the doorway of the house." *Id.* at 591–592. The victim was "in pretty rough shape" and appeared to be "combative." *Id.* at 599.

Steenburn recalled seeing two people standing near the open trunk of the Lincoln when she, Dowd, and Mr. Hollywood first arrived at the scene. *Id.* at 611. The victim was bleeding and appeared to be unconscious, but then seemed "to come back to." *Id.* at 614. Dowd also saw petitioner reaching into, and closing, the trunk of the Lincoln. *Id.* at 633, 663. Mr. Hollywood observed petitioner holding a "[f]airly long" object at his side and placing it in the trunk of his vehicle. *Id.* at 671–672, 675, 684. Petitioner told the group that the victim was lying in the yard and led them toward the victim. *Id.* at 676–677. The only contact between petitioner and the victim Mr. Hollywood observed was petitioner "holding [the victim] down with his foot," restraining him on the ground. *Id.* at 676.

Dean Dow, the homeowner at 15 Abeel Drive, eventually answered his front door and found Deyo in an "[e]xcited, chaotic" state. Dkt. No. 11–2 at 762. Dow ob-

served the victim laying in a flower bed and learned that the victim had been "caught ... in Mary's apartment." *Id.* at 761, 763. Petitioner appeared "aggravated" and was restraining the victim to the ground. *Id.* at 763. Dow and petitioner thereafter picked petitioner off the ground and moved him out of the flower bed and onto the lawn. *Id.* The victim had "significant bleeding" from the back of his head. *Id.* at 764–765. The police arrived shortly thereafter, and the first officer on the scene was David Darling, the police chief. *Id.* at 765.

At the close of the prosecution's case, counsel asserted that a jury instruction with regard to a justification defense was appropriate because petitioner and Deyo interrupted the victim while he was trespassing on, and burglarizing, Seeley's apartment, and the victim attempted to escape. Dkt. No. 11–4 at 1217–1222, 1238–1247. The court expressed its skepticism that a justification defense was supported by the evidence to that point, and noted that the burglary was broken up before the altercation concluded at another location. *Id.* at 1220. After further argument, the court ruled that there was "no reasonable view of the evidence to indicate that a justification defense is appropriate[.]" *Id.* at 1249.

Seeley testified on behalf of petitioner, and asserted that the victim, her ex-boyfriend, was not permitted to enter her apartment. Dkt. No. 11–4 at 1263–1264. Petitioner was Seeley's boyfriend on the date of the incident, and they had known each other for years. *Id.* at 1264. On the date at issue, Seeley and her daughter left the apartment in the early evening and returned to find it in disarray. *Id.* at 1265–1266. She had received a phone call from the victim that morning, but did not answer. *Id.* at 1267. While she was out that evening, she received 19 calls on her cell phone, dialed from her home phone, but her cell phone was turned off during that period. *Id.* at 1267–1268.

Petitioner also testified, and explained that, while towing his grandfather's car with Deyo's assistance, he received a harassing phone call dialed from Seeley's house at a time he knew Seeley to be out. Dkt. No. 11–4 at 1328–1330. The caller identified himself as "Mike," and petitioner recognized the voice from previous phone messages he overheard at Seeley's apartment. *Id.* at 1330. Petitioner stated that he was coming to the apartment and that the caller should leave. *Id.* After unhooking the towed vehicle, petitioner asked Deyo if he wanted to "take a ride" to Seeley's apartment because he was concerned for her safety. Dkt. No. 11–4 at 1332–1333. Before leaving, petitioner went into his father's garage and grabbed a "tire breaker bar"—the same object in evidence identified as a "pipe"—and placed in the back seat of his vehicle. *Id.* at 1334. He brought the breaker bar for self-defense because he was aware the victim "had a propensity for having weapons" and had "assaulted people ... with a brick hammer." *Id.*

Petitioner and Deyo drove to Seeley's apartment and, upon entering, found the victim "ransacking" the bathroom medicine cabinet. Dkt. No. 11–4 at 1346. The victim "immediately lunged" at petitioner, initiating a scuffle causing the victim, petitioner, and Deyo to tumble down two flights of stairs. *Id.* at 1348–1351. A "banister" broke off from the staircase, and the victim "stabbed [petitioner] with [it] a few times." *Id.* at 1348–1349. Eventually, the melee reached the bottom floor of the apartment building and the three men exited. Dkt. No. 11–5 at 1352. The victim stated that he "came with his ... crew from Hudson." *Id.* Deyo threatened to kill the victim, and the two continued a verbal exchange while petitioner went to his vehi-

cle and retrieved "the ratchet handle." *Id.* at 1352–1353.

Eventually, the victim began walking down the road and petitioner got into his car and picked up Deyo, who was angry. Dkt. No. 11–5 at 1355–1356. Petitioner and Deyo followed the victim to Dow's residence, and as the victim approached the front door, petitioner exited the vehicle and pursued him with the intention of "[j]ust restraining him until the police got there." *Id.* at 1358. Petitioner "grabbed [the victim] and ... threw him to the ground." *Id.* The victim resisted and returned to his feet, and attempted to strike petitioner in the head. *Id.* at 1358–1359. As the two exchanged blows, petitioner saw Deyo approach from behind the victim, and Deyo "clubbed him in the head with th[e] pipe." *Id.* Petitioner had instructed Deyo to remain in the vehicle and call the police. *Id.* at 1357, 1360. Petitioner denied striking the victim with the pipe, asking Deyo to strike the victim, or planning or intending to cause the victim serious injury. *Id.* at 1360. He also omitted from his statement to police his assertion that Deyo struck the victim with the pipe because he "felt bad" Deyo had gotten involved. *Id.* at 1370.

Following the close of evidence, counsel again requested that the court instruct the jury that petitioner "would have had the right to use force to stop" the victim from committing a trespass, criminal mischief, or burglary at the apartment, as well as to apprehend him. Dkt. No. 11–5 at 1458. Counsel expressed concern that, without a charge explaining that an individual may use non-deadly force, as opposed to deadly force, in apprehending one believed to have committed those crimes, the jury could convict petitioner as an accessory, even if his intent was simply to secure the victim. *Id.* at 1460–1463. The court declined to give such a charge and noted

that, based on the elements of the crimes, the jury had to find petitioner had the requisite intent to convict him. *Id.* at 1463.

The jury found petitioner guilty of both charges. Dkt. No. 11–5 at 1606. On February 29, 2008, the court sentenced petitioner to concurrent terms of twenty five years to life imprisonment and five years postrelease supervision. Dkt. No. 11–5 at 18, Sentencing Transcript.[4]

Petitioner appealed his conviction and in a counseled brief to the Appellate Division, Third Department, asserted that: (1) the verdict was against the weight of the evidence; (2) the trial court erred in failing to charge the jury with regard to justification; and (3) the sentence was harsh and excessive. Dkt. No. 10 at 7–27, Appellate Brief to the Appellate Division, Third Department. In a pro se supplemental brief, petitioner contended that: (1) the evidence was legally insufficient; (2) the trial court violated his constitutional rights by refusing to provide a justification charge; (3) the sentence imposed was illegal; (4) the prosecutor engaged in misconduct by threatening to incarcerate several witnesses unless they amended their statements to police; and (5) the court erroneously denied him the opportunity to cross-examine a witness. Dkt. No. 10 at 258–298; Dkt. No. 10–1 at 299–317, Pro Se Supplemental Brief to the Appellate Division, Third Department.

On March 31, 2011, the Appellate Division concluded that petitioner's sentence was illegal, modified the sentence by imposing concurrent determinate terms of 25 years imprisonment and five years postrelease supervision, and otherwise affirmed the judgment of conviction. *People v. Pine*, 82 A.D.3d 1498, 1502, 919 N.Y.S.2d 564 (3d Dep't 2011). The court found that

4. The sentencing transcript begins at page 272 of the pagination supplied by CM/ECF.

the evidence was legally sufficient to support the conviction, and that the verdict was not against the weight of the evidence. *Id.* at 1499–1500, 919 N.Y.S.2d 564. The court further concluded that the trial court did not err in refusing to charge the jury as to a justification defense pursuant to Penal Law § 35.20. *Id.* at 1500–1501, 919 N.Y.S.2d 564. Although the statute permits the use of physical force to prevent or terminate another person from committing, among other things, a criminal trespass or burglary on the premises, petitioner "would only have been justified in using force on the premises of [Seeley's] apartment building." *Id.* at 1501, 919 N.Y.S.2d 564. The Appellate Division explained that, "[o]nce the victim fled from the apartment, [petitioner] could not reasonably believe that force was necessary to prevent or terminate the commission of a burglary or criminal trespass, and the justification for the use of force cease[d]." *Id.* (citation omitted).

The Appellate Division also rejected petitioner's claim that he was justified in using force to effect the arrest of the victim for the crimes he committed in Seeley's apartment. *Pine*, 82 A.D.3d at 1501, 919 N.Y.S.2d 564 (citing Penal Law § 35.30(4)).[5] The Appellate Division concluded that the victim did not commit any of the crimes set forth in Penal Law § 35.30(4)(b), and that the trial court correctly determined that "the evidence did not support a reasonable belief on [petitioner's] part that he was defending himself from the imminent use of deadly force by the victim" once the victim had left the apartment building on foot. *Id.* Thus, "the

jury would either view the evidence to find that defendant was not guilty or that he was guilty and not justified in using deadly force against the victim." *Id.* Petitioner sought leave to appeal to the New York Court of Appeals, and that application was denied on August 5, 2011. *People v. Pine*, 17 N.Y.3d 820, 929 N.Y.S.2d 809, 954 N.E.2d 100 (2011).

In December 2011, petitioner filed a pro se motion to vacate the judgment pursuant to Criminal Procedure Law ("CPL") § 440.10. Dkt. No. 10–2 at 581–592, Notice of Motion and Affidavit in Support of CPL § 440.10 Motion, dated December 2, 2011. Petitioner asserted that counsel rendered ineffective assistance because he failed to: (1) request a justification charge premised upon the victim's commission of a robbery; (2) obtain and present evidence regarding the victim's prior bad acts; (3) request a missing witness charge in relation to Officer Deyo; and (4) assert that the charges were part of a selective prosecution scheme. *Id.* at 584–592. In "reply" papers submitted by counsel on petitioner's behalf, petitioner also asserted that his rights pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) were violated because the prosecution failed to disclose the existence and terms of a cooperation agreement entered into with Deyo, whereby the prosecution promised not to make a sentencing recommendation in relation to his guilty plea. *Id.* at 594–600, Attorney Affirmation in Support of Petitioner's CPL § 440.10 Motion. Counsel relatedly asserted that the prosecution allowed Deyo to testify falsely

---

5. Penal Law § 35.30(4) provides in part that a private person may use non-deadly physical force when he or she "believes such to be necessary to effect an arrest or to prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense and who in fact has committed such offense." Deadly physical force may be used under those circumstances either to protect himself, herself, or a third person "from what he or she reasonably believes to be the use or imminent use of deadly physical force," or where the subject has committed, among other things, a robbery. Penal Law § 35.30(4)(a), (b).

at trial that no sentencing promise or agreement had been made. *Id.* at 601–603.

In support of these claims, counsel submitted, among other things, the transcript from Deyo's plea proceedings, affidavits in support of Deyo's motion to vacate his judgment of conviction upon his guilty plea, and an excerpt of the prosecution's brief on Deyo's direct appeal to the Appellate Division, Third Department. Dkt. No. 10–2 at 617–713. Deyo alleged in his own § 440.10 motion that his attorney conveyed to him that the district attorney "offered to make a 5 year sentencing recommendation" in exchange for his guilty plea and cooperation against petitioner, but would not reduce that offer to writing because he "would have to disclose that agreement to" petitioner's counsel. *Id.* at 672.

Deyo further contended that, although the district attorney told him during trial preparation that his cooperation would "be helpful" at his sentencing, "[t]here was no mention of a five year promised sentence." *Id.* Myron Deyo, Deyo's father, submitted an affidavit and averred that Deyo told him that the district attorney had offered a plea bargain requiring a ten-year sentence, and that Deyo had rejected that offer. *Id.* at 762. Finally, in its appellate brief on Deyo's direct appeal, the prosecution contended that Deyo's challenge was precluded by his plea of guilty because the prosecution, as agreed, made no sentencing recommendation in exchange for the plea. *Id.* at 706–709.

In opposition to petitioner's § 440.10 motion, the prosecution contended that no *Brady* violation occurred because there was no cooperation agreement with Deyo and, in any event, that it had disclosed prior to trial that Deyo pleaded guilty without any sentence promise and without a plea agreement, and provided a copy of the transcript from Deyo's plea proceed-

ing. *Id.* at 716–718, Affirmation in Opposition to Petitioner's CPL § 440.10 Motion.

The Green County Court denied petitioner's motion. Dkt. No. 10–3 at 795–811, Decision and Order, dated September 11, 2012. With regard to petitioner's claims that counsel was ineffective, the court concluded that these "purported errors ... could have been raised either during the trial, or post-verdict prior to sentence, or in the context of [petitioner's] direct appeal" and thus were not properly raised by way of a § 440.10 motion. *Id.* at 804 (citing, inter alia, CPL § 440.10(2)(c), (3)(a)). In relation to counsel's failure to seek a justification charge based upon the victim's commission of a robbery, the court also noted that the Appellate Division expressly concluded on petitioner's direct appeal that the victim had not committed a robbery and thus that a justification charge on that basis was not appropriate. *Id.* at 804–805 (citing Penal Law § 35.30(4)(b) and *Pine*, 82 A.D.3d at 1501, 919 N.Y.S.2d 564).

The Green County Court further found that petitioner's submissions refuted his *Brady* violation claim. Dkt. No. 10–3 at 806. Deyo and his attorney both stated during Deyo's plea proceeding that "no promises were made" by either the court or district attorney with respect to sentencing, and counsel specifically articulated that cooperation was not a condition of the plea. *Id.* Moreover, a copy of Deyo's plea proceeding transcript was provided to petitioner's counsel prior to Deyo's trial testimony. *Id.; see* Dkt. No. 11–1 at 458. The court also noted that, at Deyo's sentencing, the district attorney explained that Deyo had testified "without any promise or agreements relating to a recommended sentence on behalf of the People[.]" Dkt. No. 10–3 at 8–7. Although it was "obvious that ... Deyo testified at" petitioner's trial "at least in part to favorably influence his

eventual sentence," this fact did not require "the [d]istrict [a]ttorney to state the obvious," and the prosecution provided a copy of Deyo's plea transcript in any event. *Id.* at 808–809. Petitioner's counsel was able to explore this issue during his cross-examination of Deyo at trial. *Id.* at 809.

With regard to the prosecution's position in its appellate brief in Deyo's direct appeal, the court explained that "an argument by the [prosecution] in an appellate brief that essentially contends that no agreement constitutes an agreement to support the People's contention that some of [Deyo's] arguments were not preserved for appellate review does not change the facts." *Id.* The court found that the prosecution complied with its *Brady* obligations and denied petitioner's motion. *Id.* at 810–811. Petitioner sought leave to appeal from the denial, and, on December 21, 2012, that application was also denied. *Id.* at 885–891.

In March 2013, petitioner filed a motion for a writ of error coram nobis, contending that appellate counsel was ineffective for failing to assert on direct appeal that: (1) the prosecution violated its *Brady* obligation by failing to disclose Deyo's cooperation agreement; (2) Deyo testified falsely that no plea agreement existed and the prosecution did not correct this testimony; and (3) trial counsel was ineffective because he: (a) failed to request a justification charge based upon the victim's commission of a robbery; and (b) failed to request a missing witness charge with regard to Officer Deyo. Dkt. No. 10–3 at 892–910, Notice of Motion and Affidavit in

Support of Application for Writ of Error Coram Nobis, dated March 15, 2013. The Appellate Division denied petitioner's application on July 15, 2013. *Id.* at 918, Decision and Order on Motion. Petitioner sought leave to appeal the denial of his motion, and the Court of Appeals dismissed the appeal. *People v. Pine,* 22 N.Y.3d 912, 975 N.Y.S.2d 732, 998 N.E.2d 396 (2013).[6]

## III. THE PETITION

Petitioner raises the following grounds for habeas relief: (1) the prosecution failed to disclose its cooperation agreement with Deyo; (2) Deyo falsely testified that he received no consideration for his trial testimony against petitioner, and the prosecution did not correct this testimony; and (3) appellate counsel rendered ineffective assistance because he: (a) failed to raise the *Brady* violation and perjured testimony claims on direct appeal; (b) failed to assert that trial counsel was ineffective in not seeking a justification charge in defense of robbery; and (c) failed to assert trial counsel was ineffective for failing to request a missing witness charge with regard to Officer Deyo. Pet. at 6–9.

## IV. DISCUSSION

### A. Standard of Review

■ Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state

---

**6.** The Court of Appeals dismissed petitioner's appeal "upon the ground that no civil appeal lies from the order entered in this criminal proceeding[.]" *Pine,* 22 N.Y.3d at 912, 975 N.Y.S.2d 732, 998 N.E.2d 396. Apparently, petitioner "inadvertently first submitted [his] appeal as a civil appeal as of right[.]" Dkt. No. 10–3 at 920, Correspondence from Petitioner to the New York Court of Appeals. It does not appear from the record that petitioner took further action with respect to this application following the Court of Appeals' dismissal. As discussed below, petitioner asserts that appellate counsel was ineffective, and respondent does not argue that his claims are unexhausted. R. Mem. at 29–35.

court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1), (2); *Cullen v. Pinholster,* 563 U.S. 170, 131 S.Ct. 1388, 1398, 1400, 179 L.Ed.2d 557 (2011); *Premo v. Moore,* 562 U.S. 115, 120–121, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011); *Schriro v. Landrigan,* 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson,* 562 U.S. 594, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) (per curiam) (quoting *Renico v. Lett,* 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' " *Nevada v. Jackson,* —— U.S. ——, 133 S.Ct. 1990, 1992, 186 L.Ed.2d 62 (2013) (per curiam) (quoting *Harrington v. Richter,* 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)); *see Metrish v. Lancaster,* —— U.S. ——, 133 S.Ct. 1781, 1787, 185 L.Ed.2d 988 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' ") (quoting *Richter,* 562 U.S. at 103, 131 S.Ct. 770).

■ Additionally, AEDPA foreclosed " 'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.' " *Parker v. Matthews,* —— U.S. ——, 132 S.Ct. 2148, 2149, 183 L.Ed.2d 32 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779, 130 S.Ct. 1855). A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen,* 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro,* 550 U.S. at 473, 127 S.Ct. 1933. Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with " 'clear and convincing evidence.' " *Id.* at 473–474, 127 S.Ct. 1933 (quoting 28 U.S.C. § 2254(e)(1)).

### B. Grounds One and Two: *Brady* Violation and Perjured Testimony

■ Petitioner contends, in essence, that the prosecution failed to comply with its obligation to disclose *Brady* material, specifically, the alleged existence of a cooperation agreement with Deyo, petitioner's codefendant. Pet. at 6, 8. According to petitioner, this violation extended to Deyo's perjured trial testimony, in which Deyo denied the existence of any agreement related to his guilty plea. Petitioner raised these claims in his § 440.10 motion, and the state court rejected these claims, finding that no cooperation agreement existed and that Deyo's plea transcript was disclosed to counsel before he testified at trial. Dkt. No. 10–3 at 806–811. Deyo's trial testimony, the court noted, was consistent with the parties' understandings as articulated at Deyo's plea and sentencing. *Id.* at 805–807.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *see Giglio v. United States*, 405 U.S. 150, 153–155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (promises of leniency by the prosecution constitute impeachment evidence which must be disclosed pursuant to *Brady*). "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). *Brady* is not violated "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281, 119 S.Ct. 1936. Moreover, "*Brady* cannot be violated if the defendant[ ] had actual knowledge of the relevant information or if the documents are part of public records and 'defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.' " *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir.1997) (quoting *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) (further citations and internal quotation marks omitted)).

Also pertinent to petitioner's related claims, a conviction based on perjured testimony violates due process and requires reversal if "the prosecution knew, or should have known, of the perjury" and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (footnotes omitted); *accord Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir.2003); *Williams v. Duncan*, No. 9:03–CV–0568 (LEK/RFT), 2007 WL 2177075, at *16 (N.D.N.Y. July 27, 2007); *see also Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

The state court's findings that no cooperation agreement existed with Deyo and that the information regarding Deyo's plea was disclosed to petitioner are supported by the record.[7] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, [28 U.S.C.] § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, [28 U.S.C.] § 2254(d)(2)[.]" *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). "Whether cooperation agreements exist between the prosecution and its witnesses is a factual determination." *Shabazz v. Artuz*, 336 F.3d 154, 161 (2d Cir.2003) (citation omitted).

During Deyo's plea proceeding, Deyo's attorney stated that Deyo was pleading to the sole count of the indictment "without a plea bargain agreement or sentencing recommendation from" the prosecution. Dkt. No. 10–2 at 622. Deyo

---

**7.** The same factual determinations support the court's rejection of petitioner's claim that the prosecution permitted Deyo to provide perjured testimony without correction. Although the state court referred to petitioner's claim as an alleged *Brady* violation in its decision and order, its discussion of the facts reveals that the court also adjudicated petitioner's related claim of perjured testimony on the merits. *See generally Johnson v. Williams*, —— U.S. ——, 133 S.Ct. 1088, 1092–1094, 185 L.Ed.2d 105 (2013).

acknowledged his understanding that there was no sentencing recommendation from the prosecution, nor a commitment from the court. *Id.* at 630–632. The district attorney also stated his understanding that the prosecution could "argue in favor of anything that it deems appropriate at the appropriate time." *Id.* at 632–633. During the trial, petitioner's counsel acknowledged on the record that the prosecution had provided a copy of the transcript of Deyo's plea proceeding, Dkt. No. 11–1 at 458, and Deyo testified that no specific "deal" had been "worked out" in exchange for his guilty plea. Dkt. No. 11–4 at 1147. At Deyo's sentencing, the district attorney again noted that, at the time of Deyo's plea, "there was no arrangement regarding a recommendation for any particular sentence from the People" and that Deyo had testified "without any promise or any recommended sentence on behalf of the People." Dkt. No. 10–3 at 850. The district attorney did not recommend a particular sentence. *Id.*[8]

In his § 440.10 motion, petitioner relied upon Deyo's self-serving assertion, in his own motion to vacate his judgment of conviction, that he learned from his counsel that the prosecution would not reduce a plea offer in writing because it would be required to disclose the offer to petitioner. Dkt. No. 10–2 at 672. Deyo's contention followed his statements in open court, during his plea colloquy, that no specific sentence recommendation or commitment had been extended, a sentiment repeated by Deyo at trial and Deyo's counsel and the district attorney at Deyo's sentencing.[9]

Petitioner also relied upon the prosecution's respondent's brief on Deyo's direct appeal, in which the prosecution advanced a legal argument that Deyo's claims were precluded because he knowingly pleaded guilty without a sentence recommendation or commitment, and the prosecutor offered no recommendation at the time of sentence. *Id.* at 706–709. As the state court concluded, the prosecution's assertion on Deyo's appeal, in support of a technical legal argument related to the availability of Deyo's appellate recourse, did not serve to undermine a plain reading of his plea colloquy, at which the parties and the court stated an understanding that, quite simply, no promises or commitments were being extended. Dkt. No. 10–3 at 810. Counsel's cross-examination of Deyo at the trial reveals that he was aware that Deyo pleaded guilty without a specific sentence commitment in place. Petitioner has not rebutted the presumption that the state court's factual determinations in this regard were correct by clear and convincing evidence. *Schriro,* 550 U.S. at 473–474, 127 S.Ct. 1933; *Shabazz,* 336 F.3d at 161; 28 U.S.C. § 2254(e)(1).

In sum, the state court's rejection of petitioner's claims in this regard was neither contrary to, nor an unreasonable application of, Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §§ 2254(d)(1), (2); *see Bell v. Cone,* 535 U.S. 685, 698–699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). These claims will therefore be denied and dismissed.

---

8. "The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony." *Shabazz,* 336 F.3d at 165. Moreover, a witness's "general and hopeful expectation of leniency is not enough to create an agreement or an understanding that [he] would, in fact, receive leniency in exchange for [his] testimony." *Id.* at 163 (citation and internal quotation marks omitted).

9. Respondent advises that Deyo's CPL § 440.10 motion was denied following a hearing. R. Mem. at 28, n. 7.

## C. Ground Three: Ineffective Assistance of Appellate Counsel

 Petitioner asserts that appellate counsel was ineffective for failing to argue, on his direct appeal, that: (a) the prosecution did not disclose a cooperation agreement with Deyo, and obtained petitioner's conviction upon Deyo's perjured testimony in that regard; (b) trial counsel was ineffective in not seeking a justification charge in defense of robbery; and (c) trial counsel was ineffective because he failed to request a missing witness charge with regard to Officer Deyo. Pet. at 8–9. Petitioner raised these claims in his application for a writ of error coram nobis, and the Appellate Division summarily rejected them and denied his motion. Dkt. No. 10–3 at 892–910, 918. The state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

A petitioner seeking to establish constitutionally ineffective assistance of counsel must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Even if a petitioner can establish that counsel was deficient, he still must show that he was prejudiced. *See id.* at 693–694, 104 S.Ct. 2052; *accord Premo,* 562 U.S. at 121, 131 S.Ct. 733 ("[Petitioner] must show both deficient performance by counsel and prejudice.") (citation and internal quotation marks omitted).

 The same standard applies to claims of ineffective assistance of appellate counsel, *Smith v. Robbins,* 528 U.S. 259,

285–286, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Smith v. Murray,* 477 U.S. 527, 535–536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), and "must be applied with scrupulous care" in habeas proceedings, because such a claim "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial] proceedings[.]" *Premo,* 562 U.S. at 122, 131 S.Ct. 733. When evaluating an ineffective assistance claim under § 2254(d), the court's review is "doubly deferential" in that "[w]e take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Pinholster,* 131 S.Ct. at 1403 (citations and quotation marks omitted). The habeas court must afford the state courts "more latitude to reasonably determine that a defendant has not satisfied th[e] standard." *Knowles v. Mirzayance,* 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009). "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). "Counsel is not obliged to advance every nonfrivolous argument that could be made." *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001) (citations omitted); *accord Robbins,* 528 U.S. at 288, 120 S.Ct. 746 ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.").

In this case, appellate counsel filed a competent, twenty-five page appellate brief asserting that petitioner's conviction was against the weight of the evidence, that the trial court erred in not instructing the jury as to a justification defense, and that the sentence was harsh and excessive.

Dkt. No. 10 at 2–27. Counsel contended that petitioner's version of events was more plausible than that of his codefendant, Deyo, and that, having caught the victim committing crimes within Seeley's apartment, petitioner was justified in his use of force to terminate the victim's effort and secure his arrest. Moreover, a review of the trial transcript reveals that trial counsel zealously represented petitioner, thoroughly cross-examining the eyewitnesses' often limited accounts of the altercation, highlighting that the victim acted aggressively toward petitioner and Deyo, and asserting, at length, that petitioner was entitled to a justification charge. *See e.g.* Dkt. No. 11–2 at 557–558, 599, 659–663, 687, 826–828, 1138–1147, 1231–1257.

As discussed above, the record does not support petitioner's proposition that an undisclosed cooperation agreement existed between the prosecution and Deyo. Deyo, the court, and the prosecution noted on the record, at the time of both Deyo's plea and sentencing, the understanding that his plea was being taken with no particular sentencing recommendation or commitment from the court. Counsel was provided with a copy of the transcript of Deyo's plea proceeding, and cross-examined him with regard to his plea and sentencing exposure. In light of the lack of evidence in the record on appeal that the prosecution violated its *Brady* obligation or that Deyo testified falsely regarding his plea, appellate counsel's performance was not deficient for failing to advance this claim.[10] *See Baptiste v. Ercole*, 766 F.Supp.2d 339, 367 (N.D.N.Y.2011) ("Since Petitioner's 'predicate claim for ineffective trial counsel is meritless, his claim for ineffective appellate counsel must be dismissed.' ") (quoting *Brown v. Perlman*, No. 1:07–CV–8672, 2008 WL 2009220, at *29 (S.D.N.Y. May 8, 2008)); *see also Beauharnois v. Chappius*,

No. 9:12–CV–1283 (FJS/ATB), 2015 WL 893091, at *29 (N.D.N.Y. Mar. 2, 2015).

Petitioner's claim that appellate counsel should have asserted that trial counsel was ineffective in not seeking a justification charge based upon the victim's purported commission of a robbery at Seeley's apartment is similarly unavailing. At trial, counsel requested a justification charge based upon the victim's commission of a burglary, trespass, or criminal mischief. Dkt. No. 11–5 at 1457–1464. Appellate counsel advanced the same claim on appeal. Dkt. No. 10 at 16–19. The Appellate Division concluded that "the [trial] evidence could only be interpreted ·such that [petitioner] was responsible for the use of deadly force—either as a principal or accomplice—or was not in any way responsible." *Pine*, 82 A.D.3d at 1501, 919 N.Y.S.2d 564. As the Appellate Division noted, deadly force is justified in effecting an arrest for only certain crimes enumerated in Penal Law § 35.30(4)(b), including robbery, and, based on the evidence, the victim "did not commit any of the listed crimes" in the statute. *Id.*

Finally, the Appellate Division also concluded that petitioner could not have reasonably believed that the victim "would imminently use deadly force against him" after he left Seeley's apartment on foot. *Id.* Thus, although neither trial nor appellate counsel advanced a claim that petitioner was justified in his use of force based on the victim's alleged commission of a robbery, such a claim clearly would not have succeeded in any event. Appellate counsel· focused his efforts on other colorable claims, including a justification claim based upon crimes that the victim appeared to be committing when the altercation took place. That decision was a tactical one and did not render his representation deficient. *See Yarborough*, 540 U.S. at 8, 124

---

**10.** As respondent notes, Deyo's affidavit in support of his own § 440.10 motion also was

not part of the record on appeal in petitioner's direct appeal. R. Mem. at 32.

S.Ct. 1; *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Consequently, the Appellate Division's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable determination of the facts in light of the evidence presented.

 Finally, petitioner contends that appellate counsel should have asserted that trial counsel was ineffective for not requesting a missing witness charge with regard to Officer Deyo. Pet. at 8–9. Officer Deyo, according to petitioner, witnessed the victim's "combative behavior" at Dow's residence, and overheard Deyo admit that he himself struck the victim in the head and "was going to kill him." *Id.* To warrant a missing witness charge under New York law, the party requesting the charge must show that "the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case, that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him, and that the witness is available to such party." *People v. Gonzalez,* 68 N.Y.2d 424, 427, 509 N.Y.S.2d 796, 502 N.E.2d 583 (1986); *see e.g. Mobley v. Kirkpatrick,* 778 F.Supp.2d 291, 310–311 (W.D.N.Y.2011).

In this case, Deyo himself testified that, during a 911 call he placed, he stated that he was "going to end up killing this guy." Dkt. No. 11–4 at 1151. Counsel cross-examined Deyo extensively with regard to his statements to the police dispatcher during the call, including Deyo's statement that he struck the victim, and recordings of those calls were played. *Id.* at 1149–1150. Additionally, other witnesses testified that the victim was acting in a combative manner during the altercation and was being restrained. *E.g.* Dkt. No. 11–2 at 599, 687; Dkt. No. 11–3 at 810. The testimony also disclosed that Officer Deyo was

Deyo's brother, and that Officer Deyo was not the sole officer at the scene. Dkt. No. 11–2 at 765. The fatal blows to the victim—and all of the preceding events during the altercation—occurred before any law enforcement officer was present. Thus, even if Officer Deyo would have testified as petitioner suggests, he would not have offered noncumulative testimony favorable to the prosecution. Petitioner would thus not have been entitled to a missing witness charge. *See Campbell v. Lee,* No. 1:11–CV–4438, 2014 WL 6390287, at *4 (S.D.N.Y. Nov. 17, 2014) (claim that counsel was ineffective for not seeking a missing witness charge "must fail because the video technician's testimony would have been cumulative of much other testimony at the trial and, therefore, under New York law, [petitioner] was unambiguously not entitled to a missing witness charge.") (citing *Gonzalez,* 68 N.Y.2d at 428, 509 N.Y.S.2d 796, 502 N.E.2d 583); *Arena v. Kaplan,* 952 F.Supp.2d 468, 489 (E.D.N.Y.2013) ("A missing witness charge is not appropriate when the witness's testimony would merely corroborate the testimony of other witnesses.") (citation omitted).

In sum, the state court's conclusion that appellate counsel did not render deficient representation by not raising on appeal these claims of trial counsel ineffectiveness was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Petitioner's claims will therefore be denied and dismissed.

## V. PETITIONER'S MOTION

On April 6, 2015, petitioner filed a motion, pursuant to CPL § 460.50 for "bail pending an appeal that has been … submitted in the form of" his habeas petition. Dkt. No. 13 at 1.[11] Petitioner reiterates the

11. Citation is to the pagination provided by CM/ECF.

arguments raised in his petition and appears to assert that he is not a flight risk. *Id.* at 2–3.

 Preliminarily, the authority pursuant to which petitioner seeks bail is a state statute permitting a criminal defendant to seek bail or release pending a direct appeal from a judgment or sentence to a state intermediate appellate court. CPL § 460.50(1). The statute is inapplicable here. In any event, while federal courts have authority to grant bail to habeas petitioners, that "power is a limited one, to be exercised in special cases only." *Mapp v. Reno,* 241 F.3d 221, 226 (2d Cir.2001) (citing *Ostrer v. United States,* 584 F.2d 594, 596 n. 1 (2d Cir.1978)). To be entitled to bail, a petitioner must show that "the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Id.* (quoting *Grune v. Coughlin,* 913 F.2d 41, 44 (2d Cir.1990) (internal quotation marks omitted) (alterations in original)). In light of the above determinations that the grounds raised in the petition do not warrant habeas relief, petitioner's motion will be denied with prejudice.

## VI. CONCLUSION

Therefore, it is

ORDERED that

1. The petition, Dkt. No. 1, is **DENIED AND DISMISSED** in its entirety;

2. Petitioner's motion for bail, Dkt. No. 13, is **DENIED** with prejudice;

3. No Certificate of Appealability shall issue because petitioner failed to make a "substantial showing of the denial of a

constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[12] and

4. The Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

IT IS SO ORDERED.

---

**12.** *Miller–El,* 537 U.S. at 336, 123 S.Ct. 1029; *see Richardson v. Greene,* 497 F.3d 212, 217 (2d Cir.2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that ju-

rists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).